*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* FLOYD/DULANEY, Minors

UNPUBLISHED
March 21, 2024

No. 362625
Macomb Circuit Court
Family Division
LC Nos. 2019-000015-NA
            2021-000219-NA

Before: CAVANAGH, P.J., and JANSEN and MALDONADO, JJ.

PER CURIAM.

Respondent-mother, S. Barksdale, appeals as of right the trial court's order terminating her parental rights to the minor children, MF and ND, pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*vi*). We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In late 2018, respondent lived with her partner, A. Floyd, and their two children, MF and AF. Also living in their apartment was ND, respondent's then six-year-old daughter from a prior relationship. On the morning of December 25, 2018, the family began celebrating Christmas by opening gifts. Later that afternoon, the family drove to the maternal grandmother's home to celebrate the holiday. According to respondent, AF appeared to have fallen "asleep" in her car seat and she remained asleep as the family made the approximate 25-minute trip to the grandparent's home. After arriving at the home, a relative noted that something appeared to be wrong with AF, who had been "sleeping" in a relative's arms. At that point, respondent, Floyd, and another family member drove AF to the hospital, which was across the street from the grandmother's home. Resuscitation efforts were unsuccessful and the child was pronounced deceased. An autopsy did not initially reveal the cause of AF's death, but toxicology tests, received in January 2019, indicated that AF died from an overdose of fentanyl. Respondent and Floyd were arrested that day. Pursuant to a safety plan, MF and ND were first placed together in a licensed foster home and then, eventually, with relatives.

On January 10, 2019, the Department of Health and Human Services (DHHS) petitioned the court to formally remove ND and MF from the care of respondent, Floyd, and ND's legal

father, A. Dulaney. DHHS later amended the petition to seek termination of respondent's and Floyd's parental rights at the initial disposition.

Respondent's and Floyd's adjudication trial was adjourned multiple times. Initially the delays were related to criminal matters arising from AF's death. At some point, respondent pleaded no contest to manslaughter and second-degree child abuse, and she was sentenced to five years' probation, with one year to be served in jail. Floyd pleaded no contest to second-degree murder, second-degree child abuse, and delivery or manufacture of a controlled substance. The court sentenced him to 5 to 20 years' imprisonment. After the criminal matters concluded, restrictions related to the COVID-19 pandemic further delayed the adjudication trial.

Ultimately, a combined adjudication trial and hearing regarding statutory grounds for termination was held in May 2022, following which the trial court found that a preponderance of evidence supported the court's assumption of jurisdiction over the children under MCL 712A.2(b)(1) and (2), and that clear and convincing evidence supported termination of respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*vi*). Following a two-day best-interest hearing in June 2022, the court found that termination of respondent's parental rights was in the children's best interests. This appeal followed.

## II. ANALYSIS

Respondent does not challenge the trial court's holding that statutory grounds for termination were established under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*vi*). Instead, she only challenges the trial court's finding that termination of her parental rights was in the children's best interests. We find no error in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). When more than one child is involved, a trial court must consider each child's best interests separately, *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012), but a court need not make "individual" and "redundant factual findings" if the children's interests do not significantly differ, *In re White*, 303 Mich App

at 715-716. Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App at 129.

Respondent argues that the trial court erred because it considered just one factor, AF's death, which respondent contends is insufficient to support the court's best-interest decision. Initially, respondent does not cite any authority for the proposition that a court's best-interest determination cannot be based on the weight given to one factor. Indeed, this Court gives deference to a trial court's special opportunity to judge the weight of the evidence. *In re TK*, 306, Mich App 698, 710; 859 NW2d 208 (2014). Further, considering that a child died while in respondent's care under egregious circumstances, the court would have been justified in finding that this factor was deserving of significant weight because it revealed a side of respondent that posed a serious danger to her children. In any event, contrary to respondent's assertions, the trial court did not only find that termination of respondent's parental rights was warranted because of AF's death. Indeed, respondent later acknowledges that the court considered the children's well-being, their need for finality, and the fact that the children were placed with relatives. A review of the court's written decision confirms that it also considered the existence of a parent-child bond and it contemplated the propriety of a guardianship for MF. There is no record support for respondent's representation that the trial court only considered AF's death when evaluating the children's best interests.

Although the children shared many of the same needs and interests, they were not similarly situated in many respects. The children are only three years apart in age. While this age difference might seem inconsequential because both are still very young, under the circumstances in this case the age differential was significant. At the time of AF's death, ND was six years old. She had a specific recollection of the traumatic events. MF was only three years old and there is no evidence that he recalled anything related to his sister's death. While both were placed with relatives, only MF's caregiver wished to plan permanently for the child in her care. ND, by contrast, had the potential of being returned to her legal father's care and custody. The court recognized the differing attributes and it carefully considered the best interests of each child individually. Employing a similar analysis, the trial court did not clearly err when it found that termination of respondent's parental rights was in each child's best interests.

The trial court did find that one factor was applicable to both children and it weighed in favor of termination. The court found that neither child would be safe in respondent's care. The court did give great weight to the fact that an 18-month-old child died in respondent's care. However, it was not only the death of a child, but the circumstances surrounding that death and respondent's later actions that also influenced the court's conclusion that the children would not be safe if returned to respondent's home.

A preponderance of the evidence supports the court's finding that AF's death was not just the product of negligent supervision of a curious toddler. The child died from fentanyl poisoning, a drug that should never have been in respondent's home. The medical examiner testified that there was no legitimate explanation, medical or legal, for fentanyl to be in the home. From the evidence presented, the court could easily have concluded that AF encountered the fentanyl because of criminal activity in the home. Further, ND testified that AF drank from a cup that

respondent left on a table in front of the couch. ND's testimony also supports the trial court's finding that AF's deteriorating condition was brought to respondent's attention, but that respondent ignored the child because she was preoccupied with cooking. Although there were some discrepancies in ND's testimony, this Court gives deference to the trial court's special opportunity to evaluate the credibility of witnesses who appear before it. *In re TK*, 306 Mich App at 710. Further, while respondent was in police custody, she surreptitiously attempted to alert Floyd by using her Apple watch to text a message that included warning him of a search warrant and cryptically instructing him to "get rid of Sheila ASAP." There was also evidence from which the court could find that respondent and Floyd maintained their relationship after the filing of the petition. Considering this record, the trial court did not clearly err when it found that a preponderance of the evidence demonstrated that respondent lacked the judgment and parenting ability to properly supervise a child or keep that child safe.

The children's future safety was just one factor the court considered when contemplating MF's best interests. MF was three years old when he was removed from respondent's care. At the conclusion of the best-interest hearing, he was only a few months shy of his seventh birthday. Accordingly, MF had spent more than half his life in foster care placed with a paternal great aunt. The relative was providing for his needs and, should the court terminate respondent's parental rights, was willing to adopt MF. The evidence established that the paternal aunt was a teacher who had 30 years' experience teaching young children, including special-needs children. This caregiver had seen to MF's medical, emotional, and educational needs, and she had offered him the opportunity to participate in a variety of sports and summer camp programs. The caseworker testified that MF had adjusted well and was comfortable in this placement. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App at 42. A court may also consider the possibility of adoption. *In re White*, 303 Mich App at 713. A preponderance of the evidence supports a finding that the paternal aunt's home was preferable to respondent's home because it would provide MF with the care and safety he required to facilitate his continued growth and development.

The trial court also considered the presence of a parent-child bond and it seemed to assume that such a bond existed between respondent and MF. However, it gave little weight to this factor. We find no error in the court's analysis. While there may have been a bond between respondent and her son, that fact did not outweigh MF's need for a safe and stable home environment that was free from drug use and criminal activity. Given MF's young age, it was critical that he be placed with someone who could provide adequate care and supervision. Under the circumstances, the trial court gave appropriate consideration and weight to the existence of a parent-child bond.

The trial court did acknowledge that MF was placed with a relative and it understood the significance of such a placement. Pursuant to MCL 712A.19a(8)(a), a child's placement with a relative weighs against termination. Nonetheless, the court still concluded that this fact did not outweigh other considerations. It was within the court's authority to do so. While the fact that a child is living with a relative must be considered, a trial court may still terminate parental rights in lieu of placement with a relative if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43.

Regarding ND, the court similarly considered the potential risk of harm in respondent's care, but it also found compelling the child's need for permanence and finality. It is clear from the

record that witnessing a sibling's death, which precipitated unstable placement, was traumatizing and it took a significant toll on ND's emotional well-being. ND had been moved from a foster home to relative placement. She was then placed in the custody of her legal father. Even that placement did not prove to be stable, in part because of the legal gamesmanship played by respondent regarding her securing a custody order from another county. After ND was removed from her father's home in California and forced to return to Michigan, she was again placed with a paternal aunt. This instability was clearly detrimental to ND's sense of security. ND exhibited negative behaviors in school and in the foster home. She also had begun engaging in acts of self-harm. By all accounts, the only time ND had been relatively happy and demonstrated an improvement in her behavioral issues was when she was placed with her legal father. ND's relative caregiver was unwilling to adopt ND. Indeed, because of ND's behavioral issues, the caregiver had requested a change in placement. Should the trial court terminate parental rights, DHHS intended as a permanency plan to place ND in the custody of her legal father.

The evidence supports a finding that terminating respondent's parental rights to ND would allow her to achieve the permanency and finality she required to better be able to address her trauma. ND's therapist explained that witnessing AF's death, being moved around multiple times, and even not seeing respondent, were all traumatic events. The therapist tried to discuss with ND the traumas she experienced, but the child was very guarded, particularly regarding her sister's death. The therapist explained that ND still needed to process these things, but that she was not ready to do that yet. Moreover, simply placing ND with her legal father in lieu of terminating respondent's parental rights would not have provide ND with the finality she needed. Under such an arrangement, there would still be uncertainty and instability created by the prospect of respondent's continued involvement in ND's life. ND's need for finality was a factor that weighed in favor of terminating respondent's parental rights.

The trial court also considered the nature of the bond between respondent and ND and concluded that the existence of a bond was not a factor that weighed in favor of preserving respondent's parental rights. We find no error in the court's findings. ND testified that she did not trust respondent and would not trust spending even a night in respondent's care. ND repeatedly indicated that she wished to live with her legal father. Indeed, ND disclosed to her caregiver that if she were placed with respondent, she would run away from home. Considering the evidence presented, any parent-child bond that remained was not significant enough to be given much weight.

In sum, the trial court did not clearly err when it found that termination of respondent's parental rights was in the children's best interests. The court properly weighed appropriate factors when considering each child's needs. On balance, a preponderance of the evidence supports the trial court's finding that the evidence weighed in favor of terminating respondent's parental rights.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Allie Greenleaf Maldonado